UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

MARK BANKS,                                )
                                           )
        PLAINTIFF,                         )
                                           )
vs.                                        )   CASE NO. 09-CV-333-FHM
                                           )
MICHAEL J. ASTRUE,                         )
Commissioner of the                        )
Social Security Administration,            )
                                           )
        DEFENDANT.                         )

## OPINION AND ORDER

Plaintiff, Mark Banks, seeks judicial review of a decision of the Commissioner of the Social Security Administration denying Social Security disability benefits.[1] In accordance with 28 U.S.C. § 636(c)(1) & (3) the parties have consented to proceed before a United States Magistrate Judge.

The role of the Court in reviewing the decision of the Commissioner under 42 U.S.C. §405(g) is limited to determining whether the decision is supported by substantial evidence and whether the decision contains a sufficient basis to determine that the Commissioner has applied the correct legal standards. *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Doyal v. Barnhart*, 331 F.3d 758 (10th Cir.

---

[1] Plaintiff's June 2, 2006 applications for Disability Insurance and Supplemental Security Income benefits were denied initially and upon reconsideration. A hearing before an Administrative Law Judge (ALJ) was held July 29, 2008. By decision dated February 24, 2009, the ALJ entered the findings which are the subject of this appeal. The Appeals Council denied review of the findings of the ALJ on March 25, 2009. The action of the Appeals Council represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

2003). The Court may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *See Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. *White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2002).

Plaintiff was 48 years old at the time of the hearing. [R. 26]. He claims to have been unable to work since May 19, 2006, due to Diabetes, Type 2, with neuropathy;[2] migraine headaches; arthritis; vision problems; knee, back, hip and neck pain; Hodgkin disease;[3] asthma; and Carpal Tunnel Syndrome.[4] [R. 148-171]. The ALJ determined that Plaintiff has severe impairments consisting of diabetes; heart problems; headaches; problems with back, feet, hands, legs, knee, ears, vision, stomach and thyroid; depression; anxiety; schizophrenia; vertigo and Hodgkin's disease. [R. 11]. He found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments.[5] The ALJ assessed Plaintiff

---

[2] Type 2 Diabetes is a chronic (lifelong)disease marked by high levels of sugar (glucose) in the blood and is the most common form of diabetes. *See* medical encyclopedia online at: http:www.nlm. nih.gov/medlineplus/ency/article/000313.html (Update Date: 5/20/2009). Diabetic neuropathy is a common complication of diabetes in which nerves are damaged as a result of high blood sugar levels (hyperglycemia). *See Id.* 000693.htm (Update Date: 8/20/2008).

[3] Also called Hodgkin lymphoma, Hodgkin Disease is cancer of lymph tissue found in the lymph nodes, spleen, liver and bone marrow. *See* medical encyclopedia online at: http://www.nlm.nih.gov/med lineplus/hodgkindisease.htm.

[4] Carpal Tunnel Syndrome is pressure on the median nerve, the nerve in the wrist that supplies feeling and movement to parts of the hand which can lead to numbness, tingling, weakness or muscle damage in the hands and fingers. *See* medical encyclopedia online at: http://www.nlm.nih.gov/medline plus/ency/article/000433.htm (Update Date: 10/10/2009).

[5] At step three of the sequential analysis, the ALJ determines whether a claimant's impairment "is equivalent to one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Bowen v. Yuckert,* 482 U.S. 137, 141, 107 S.Ct. 2287,
(continued...)

2

with an residual functional capacity (RFC) to perform light work with additional limitations. [R.14, 18]. Based upon the hearing testimony of a Vocational Expert (VE), the ALJ found that Plaintiff cannot return to his past relevant work but that there are other jobs in the economy that Plaintiff could perform with his RFC. [R. 17-18]. The ALJ concluded, therefore, that Plaintiff is not disabled as defined by the Social Security Act. [R. 19]. The case was thus decided at step five of the five-step evaluative sequence for determining whether a claimant is disabled. *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005) (describing the five steps); *Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (discussing five steps in detail).

Plaintiff asserts that: 1) the ALJ's finding at step five that Plaintiff can perform other work is not supported by substantial evidence; 2) the ALJ's finding that Plaintiff's diabetes mellitus did not meet or equal Listing 9.08 was not supported by substantial evidence; 3) the ALJ failed to develop the record regarding Plaintiff's neuropathy; and 4) the ALJ misapplied the law when assigning weight to the opinion evidence. [Plaintiff's Opening Brief, Dkt. 12]. For the following reasons, the Court finds this case must be reversed and remanded to the Commissioner for reconsideration.

## Medical Record

The administrative record in this case is over 1200 pages and contains medical evidence from as far back as 1981. [Court Transcript, Dkt. 9]. Plaintiff has a long-term history of Type 2 Diabetes Mellitus, with complications first documented in the record in September 2001. [R. 417-423]. He claims a disability onset date of May 19, 2006,

---

[5] (...continued)
96 L.Ed.2d 119 (1987); 20 C.F.R. Pt. 404, Subpt. P, App. 1.

3

primarily due to problems associated with his diabetes. Because the Court finds this case must be reversed and remanded for reevaluation of the medical evidence as it relates to the ALJ's step three findings, discussion of the medical record is limited to the relevant records which were generated by OU Physicians, Bedlam Community Health[6] center (OU Physicians). [R. 800-806, 815-837, 1062-1124, 1184-1187]. Throughout the these treatment notes, Ron Saizow, M.D., is identified as the "Faculty Attending" physician who either conducted the examinations and evaluations or was in attendance while they were performed and his signature appears alongside those of the medical and nursing students who participated in Plaintiff's care.

On August 21, 2007, Plaintiff sought treatment for severe vertigo causing an increase in falls and for rash on his legs. [R. 802-403]. Blood work conducted on August 22, 2007, showed Plaintiff's glucose levels were elevated at a reading of 622.[7] [R. 800-801]. Physical examination on August 23, 2007, revealed a healthy general appearance, bruises on legs, weak heart sounds, positive Romberg's sign[8] and trouble walking. [R. 800-801]. Positive neuropathy findings were reported. *Id.* Plaintiff had been "off meds" but was unable to start insulin and his oral medications were resumed.

---

[6] The University of Oklahoma - Tulsa School of Community Medicine (Bedlam) clinic is a teaching component to OU medical, pharmacy and nursing students and offers healthcare to the indigent, at-risk school children, residents of public housing, isolated elderly, single parents and working poor. *See*: http://tulsa.ou.edu/medicine/bedlam/index.htm.

[7] Levels vary according to the laboratory but, in general, up to 100 milligrams per deciliter (mg/dL) are considered normal. Diabetes is typically diagnosed when fasting blood glucose levels are 126 mg/dL or higher. *See* medical encyclopedia online at: http://www.nlm.nih.gov/medlineplus/ency/article/003472.htm

[8] Romberg's is a diagnostic sign of tabes dorsalis and other diseases of the nervous system consisting of a swaying of the body when the feet are placed close together and the eyes are closed. *See* medical dictionary online at: http://www.merriam-webster.com/medlineplus/Romberg.

4

*Id.* During Plaintiff's physical examination on August 30, 2007, slight ataxia[9] and small bruises on both shins were noted. [R. 1121-1124]. Paperwork for an insulin product and free glucometer strips was begun. *Id.* On September 11, 2007, Plaintiff presented for a two-week followup after starting insulin injections. [R. 1104-1107]. He was reported to be adjusting well to insulin treatments. He had received his glucometer and taken 3 blood sugar readings: "two of which were 143 and 256 (the latter followed eating a doenut) [sic]. Today's blood sugar was 191 also after eating a doenut [sic]." *Id.* His misunderstanding of the dosage and frequency of oral medications was corrected and he was instructed to "only take one of the metformin[10] pills until the diarrhea resolves and then start taking bid (twice a day) again." [R. 1108]. Blood work was done on Sept. 17, 2007. [R. 1100-1103]. On September 25, 2007, Plaintiff reported he did not fill the prescription for new needles because "it was too expensive." [R. 1095-1098]. He had tripped "on some carpet while at work" and was treated at the Hillcrest emergency room but could not afford that prescription and was treating pain with Icy-Hot cream and maximum strength Tylenol. [R. 1096]. Physical examination revealed loss of proprioception[11] on his toes. *Id.* The diabetes management exam showed absent sensory-pinprick/light touch left and right medial, dorsal and lateral foot and

---

[9] Ataxia is defined as an inability to coordinate voluntary muscular movements that is symptomatic of some nervous disorders. *Id.* medlineplus/Ataxia.

[10] Metformin is used alone or with other medications, including insulin, to treat type 2 diabetes by helping to control the amount of glucose in the blood by decreasing the amount of glucose absorbed from food and made by the liver. Metformin also increases the body's response to insulin. *See* drug information online at: http://www.nlm.nih.gov/medlineplus/druginfo/meds/a696005.h5ml (Last Reviewed - 09/01/2008).

[11] Proprioception is the reception of stimuli produced within the organism. *See* medical dictionary online at: http://www.merriam-webster.com/medlineplus/proprioception.

inability to distinguish sharp from dull pain on the foot up to the ankle. [R. 1096-1097]. A note regarding Plaintiff's gait indicated he "walks without his toes on the floor and tries to look at his feet." *Id.* A letter dated September 25, 2007, signed by Neil Crittenden MSIII (medical student, third year), reads as follows:

> Mr. Banks is a patient in our practice who has diabetes with numerous complications, including neuropathy. Numerous stresses within his environment adversely impact his diabetes management, including the difficulty controlling his blood sugar.

[R. 815].

On October 9, 2007, Plaintiff was seen for mild esophagitis and he reported he had visited the hospital for vomiting and chest pain. [R. 1091-1094]. He also complained of blurring vision, chest pain, rash, headaches, and sharp pain on the left shin and left arm. *Id.* Plaintiff was advised to discontinue the metformin and nabilone[12] and his insulin was increased. [R. 1094]. Plaintiff also presented "a variety of forms that we volunteered to fill out to the best of our capabilities describing his medical symptoms." *Id.*

Plaintiff was seen in followup on October 23, 2007. [R. 1087-1090]. He reported a "Topsy turvy" day, having difficulties walking straight and having to watch where he was walking to follow the sidewalk. [R. 1087]. He said he had a range of blood sugar readings, taken 1-2 times daily, but always above 70. *Id.* His number one problem was identified as: diabetes mellitus with neuro manifestations, type II. [R. 1089]. Under impression and recommendations, the following was written:

---

[12] Nabilone is used to treat nausea and vomiting. *See* drug information online at: http://www.nlm.nih.gov/medlineplus/druginfo/meds/a607048.html (Last Reviewed - 09/01/2008).

> Returned completed paperwork to the patient; the forms described his medical condition. I went through each question and explained each answer to the pt. [Sections] describing the patient's loss of function were not completed because it is not in the clinic's expertise.

*Id.* Those forms bear the same date, October 23, 2007, and appear in the record at pages 817 through 837.

The first form is titled: Medical Statement Regarding Peripheral Neuropathy. [R. 817].  The first question: "Does the patient suffer from significant peripheral neuropathy?" is answered: "Yes." *Id.*  The remaining questions, which address the extent of disorganization of motor function and limitations in performing work activities, are unanswered. [R. 817-818].

The second form is titled: Statement Regarding Coronary Artery Disease. [R. 819]. Checkmarks appear next to "Anginal pain" and "Syncope or near syncope caused by cardiac condition." *Id.*  None of the questions regarding functional activities are answered. *Id.*

The third form: "Dizziness Residual Functional Capacity Questionnaire" contains questions and handwritten answers as follows:

1. Frequency and length of contact: every 2 weeks for the past 2 months;
2. Diagnoses: Type II diabetes with peripheral neuropathy and proprioception loss, major depression, mild esophagitis;
3. Does your patient have dizziness? Yes
4. If yes, what diagnosis is this dizziness related to? Type II diabetes + the [secondary] loss of proprioception in the patient's feet
5. What is the average frequency of your patient's dizziness episodes? daily, multiple times
6. How long does a typical episode last? 2-3 minute
7. Does your patient always have a warning of impending dizziness? No
8. Does dizziness occur at a particular time of the day? No

[R. 820].  The remainder of the form is blank. [R. 821-823].

7

The fourth form "Peripheral Neuropathy Residual Functional Capacity Questionnaire," likewise has only the first page filled out, as follows:

1. Frequency and length of contact: Patient seen every 2 weeks for 2 months 8/23/2007 through 10/2007;
2. Does your patient have peripheral neuropathy? Yes
3. List any other diagnosed impairments: loss of proprioception in the feet, history of depression, mild esophagitis, Type II Diabetes
4. Prognosis: permanent damage to the patient's affected peripheral nerves
5. Identify your patient's symptoms and signs: Pain; Paresthesias; Abnormal gait; Deficiencies in joint proprioception; Diarrhea; Postural hypotension; Sensory loss
6. If your patient has pain/paresthesias, characterize the severity of the pain/paresthesias: Severe
   Describe the location and frequency of your patient's pain/parethesias: The patient has severe proprioception loss in his feet. The result is that the mind does not know where his feet are located.
7. Have your patient's impairments lasted or can they be expected to last at least twelve months? Yes

[R. 824-827].

The fifth form is: "Peripheral Neuropathy Medical Assessment Form." [R. 828-832]. Answers appear only on the first page of this form, as follows:

1. Date began treatment: 8/25/07  Frequency of tx: every 2 weeks for the past 2 months
2. Does your patient exhibit peripheral neuropathy? Yes;  Other diagnoses: history of depression, mild esophagitis
3. Prognosis: peripheral neuropathy damage is permanent and can get worse
4. If your patient exhibit[s] chronic pain/paresthesia, characterize the severity of the pain/paresthesia: severe

[R. 828].  The response to the request to identify the location and frequency of pain/parethesia, was:

1. loss of proprioception in the patient's feet: constant
2. pain in the patient's lower legs: intermittent
3. pain in the patient's arms: intermittent

*Id.*

The sixth form is: "Statement Regarding Diabetes" upon which the presence of the following are indicated by checkmark:

Type II diabetes

Neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station.

[R. 833].

The seventh, and final, form is titled: "Diabetes Mellitus Residual Functional Capacity Questionnaire" and contains the following questions and answers:

1. Frequency and length of contact: every 2 weeks for 2 months
2. Diagnosis: Type II Diabetes Mellitus with peripheral neuropathy
3. Prognosis: good with treatment, but permanent nerve damage
4. Identify all of your patient's symptoms: difficulty walking; general malaise; retinopathy; psychological problem; vascular disease/leg cramping; nausea/vomiting; extremity pain and numbness; diarrhea; difficulty thinking/concentrating; dizziness/loss of balance;[13] headaches
5. Clinical findings: loss of proprioception of the patient's toes and feet. Diabetic skin ulcers on the patient's shins, and an initial random blood sugar of 622
6. Have your patient's impairments lasted or can they be expected to last at least twelve months? Yes
7. Is your patient a malingerer? No
8. Do emotional factors contribute to the severity of your patient's symptoms and functional limitations? No

[R. 834]. The remainder of the form is blank. [R. 834-837].

At a followup examination on November 13, 2007, Plaintiff stated: "the headaches have returned, caused a recent fall on back." [R. 1084-1086]. He reported having trouble remembering to take his evening insulin and other medications, that he had missed his evening insulin dose 3 times the previous week and that he was still

---

[13] A star is placed, presumably for emphasis, next to this symptom. [R. 834].

experiencing pain in his feet which increased after putting on shoes or walking. [R. 1085]. He complained of loss of sensation in his finger, that his left leg and ankles stiffen up and that his thumbs stiffen up at night. *Id.* He stopped taking metformin three weeks previously because of stomach pain and he worried "that he'll need a cane soon for ambulation." *Id.* The following clinical notation was made:

> Pt. started on 850 mg. Metformin and taken off of 500 mg Metformin due to GI upset. Encouraged the pt. to try to keep taking the Metformin and reviewed with him the ben[e]fits of Metformin in reducing [h]is blood sugar.
>
> Because his blood sugar remains around 250-290, increased the dose of the insulin [w]ith the pt to 26 units at night and 16 units before each meal.
>
> Informed the pt. we will call him in 2 weeks in the evening and he needs to report to us how his blood sugar is doing. If it is not under cont[r]ol we will manage his insulin increase over the phone and see the pt 1 month from today.
>
> The pt. has gained 30 lbs since his presentation. Informed the pt. about his weight gain and explained to him it was due to the insulin. Asked the pt. to start exercising to try to burn the energy his body is absorbing from the blood sugar. Explained that he can go to the YMCA and get a membership on a sliding scale.

[R. 1086].

Plaintiff was seen again on January 8, 2008. [R. 1079-1083]. He reported his knee buckled while he was at the store, his work place.[14] [R. 1079]. His complaints of joint pain, joint swelling, back pain, muscle weakness and arthritis were noted. [R.

---

[14] Plaintiff testified at the hearing that he "helps out" at his friend's store when he feels up to it and receives between $55 and $70 per week in cash. [R. 35-36]. Plaintiff's friend testified and corroborated Plaintiff's testimony regarding the amount of money Plaintiff is given. [R. 61-69]. The ALJ ruled that it appears Plaintiff is for the most part working a full time job, but the amount paid weekly does not rise to the presumptive level for substantial gainful activity. [R. 17].

1081]. He demonstrated decreased sensation to sharp touch in both lower extremities and diminished sensory-pinprick/light touch in his left and right medial, dorsal and lateral foot. [R. 1082]. He had a limp and very slow gait and had trouble getting up from a seated position. *Id.* Plaintiff's knee buckling was thought to be most likely associated with weakness for which consultation with a physical therapist was to be discussed. [R. 1083].

On February 5, 2008, Plaintiff was examined for vision, foot, cardiovascular and social screening. [R. 1074-1076]. Plaintiff complained of cluster headaches. *Id.* Physical examination revealed early nonproliferative diabetic retinopathy,[15] absent right and left posterior (lower limb) tibial pulses, proprioception of the toes and absent sensory-pinprick/light touch of the left and right medial foot. [R. 1075-1076].

On February 12, 2008, Plaintiff presented to discuss insulin availability and headaches. [R. 1069-1073]. His complaints of diarrhea were thought likely due to lactose intolerance. [R. 1072]. Plans were made to obtain Home $O_2$ as abortive therapy for Plaintiff's cluster headaches. *Id.* His diabetes medications were renewed and refilled. [R. 1072-1073].

Plaintiff was seen on April 8, 2008, for followup. [R. 1065-1068]. Treatment notes reflect that a discussion was held regarding a recent fall, the loss of proprioception as the most likely consideration, and the possibility of using a cane in the future. [R. 1067]. Plaintiff's cluster headaches had decreased since his last visit. [R.

---

[15] At the earliest stage of nonproliferative retinopathy, microaneurysms occur. They are small areas of balloon-like swelling in the retina's tiny blood vessels. *See* medical information online at: http://www.nei.nih.gov/health/diabetic/retinopathy.asp. (page last modified in May 2010).

1068]. Exercises and stretching each night were suggested as a way to resolve muscle cramps. *Id.*

A letter dated August 12, 2008, was signed by Neil Crittenden, MSIV. [R. 1186-1187]. Plaintiff was reported to have made all his appointments and adhered to both his oral and injected medication plan. He reported less success in following diet and exercise recommendations. [R. 1186]. Mr. Crittenden wrote:

> The vascular and neurological damage of long-standing diabetes has resulted in dizziness, difficulty walking, diarrhea, and loss of proprioception (he has difficulty knowing where his feet are located). This has resulted in occasional falls, and weight gain due to the insulin treatment. The patient received an eye exam last February and does not have any retina complications at this time. He is adhering to medical management, but his Hemoglobin A1c which follows sugar control, was as low as 7.9% in January 2008, but rose to 10.2% in April. Our goal for these values has been 7.0% or less. He is scheduled to be tested again soon. Despite medical treatment, his current dizziness, diarrhea, and loss of proprioception are unlikely to improve, but do risk getting worse without continued treatment.

[R. 1186]. Mr. Crittenden reported Plaintiff's head injury was improving and he was expected to make a full recovery; that his low blood pressures may contribute to his dizziness "but he is able to function at this time;" and that his mild esophagitis is not changing. *Id.*

## The ALJ's Decision

The ALJ found Plaintiff's diabetes to be a severe impairment at step two. [R. 11]. He also found Plaintiff had: heart problems; headaches; "problems with back, feet, hands, legs, knee, ears, vision, stomach, and thyroid;" depression; anxiety; schizophrenia; vertigo and Hodgkin's disease. *Id.* The ALJ did not specify which, if any,

12

of these "problems" were symptoms of neuropathy or whether they were associated with Plaintiff's diabetes.

The ALJ summarized a portion of the medical records from OU Physicians, but did not mention the content of the "Statement Regarding Diabetes" or the other forms signed by Neil Crittenden and Ron Saizow, M.D. [R. 12, 15, 16].

After setting forth the criteria of Listing 9.08, the ALJ said:

> Even though the claimant has been diagnosed with neuropathy, it would not be considered a significant and persistent disorganization of motor function.

[R. 13].

The ALJ said he gave considerable weight to the OU Physicians stating: "These records do indicate the claimant's problems and, importantly, his non-compliance with treatment." [R. 16-17].

The ALJ also gave considerable weight to the opinions of the consultative examining physicians, Angelo Dalessandro, D.O., and Shashi Husain, M.D, saying "These reports are consistent with the records as a whole." [R. 16].[16] The ALJ cited the reports of Drs. Dalessandro and Husain, as well as the report of the mental consultative examining psychologist, as support for his RFC determination. [R. 17].

---

[16] Dr. Dalessandro examined Plaintiff on October 26, 2006. [R. 681-689. Dr. Dalessandro found Plaintiff's gait was normal and "did not notice an imbalance as he was walking." *Id.* Dr. Husain examined Plaintiff on May 2, 2007, and found sluggish ankle jerks, diminished sensation to pinprick below the knees bilaterally, normal gait and ability to walk on toes and heels without any difficulty. [R. 788-789]. Dr. Husain concluded Plaintiff has minimal peripheral neuropathy, most likely secondary to diabetes mellitus and chronic daily headaches secondary to muscle tension. [R. 789].

### Discussion

Plaintiff contends he meets the Listing for Diabetes Mellitus, which reads as follows:

> 9.08 *Diabetes mellitus.* With:
> A. Neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C); or
> B. Acidosis occurring at least on the average of once every 2 months documented by appropriate blood chemical tests (pH or $PCO^2$ or bicarbonate levels); or
> C. Retinitis proliferans; evaluate the visual impairment under the criteria in 2.02, 2.03, or 2.04.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 9.08.

In his brief, Plaintiff's counsel pointed only to the records cited by the ALJ as support for this argument. [Dkt. 12, p. 3-4]. Counsel for the Commissioner is correct that the evidence cited by Plaintiff's counsel, standing alone, is not sufficient medical evidence to establish that Plaintiff's impairment meets or equals a Listing. [Dkt. 13, p. 6-7]. *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005) (claimant has the step three burden to present medical evidence establishing that impairments meet or equal listed impairments).

However, the Court's review entails a thorough examination of the record to ensure that the substantiality test has been met. *See Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005) (although court does not reweigh evidence, record as a whole is reviewed, including evidence that may undercut or detract from the ALJ's findings). And, when the record contains significantly probative evidence that the ALJ did not properly consider or that he failed to adequately discuss, remand may be

appropriate. *See Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996) (the Commissioner's failure to apply the correct legal standards, or to show that he has done so is grounds for reversal). This is just such a case.

It is well settled that the ALJ is required to "evaluate every medical opinion" he receives. 20 C.F.R. § 404.1527(d); *see also Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989) (requiring ALJ to consider all relevant medical evidence of record in reaching a conclusion as to disability). The ALJ must discuss in his decision the uncontroverted evidence he did not rely upon and any significantly probative evidence that he rejects. *See Frantz v. Astrue*, 509 F.3d 1299, 1303 (10th Cir. 2007). Most importantly, an ALJ must fully evaluate evidence from the claimant's treating source. 20 C.F.R. § 404.1527(d)(2); *see also Doyal*, 331 F.3d at 762 (ALJ must give good reasons in his decision for the weight assigned to a treating physician's opinion).

The language in the "Statement Regarding Diabetes," signed by Plaintiff's treating physician, Ron Saizow, M.D., and Neil Crittenden, the medical student working under Dr. Saizow's guidance, is identical to the language contained in Listing 9.08A. [R. 833]. That statement and the content of the other six forms filled out and signed by Plaintiff's treating source were not mentioned in the ALJ's decision. Because of the potential significance of this opinion evidence to the step three determination, the ALJ was required to address it. *See Carpenter v. Astrue*, 537 F.3d 1264 (10th Cir. 2008) (discussing contrast between checklist form used to record results of thorough physical examination and the checklist form used by non-examining agency physicians).

In addition, the ALJ acknowledged that the treatment records from OU Physicians "indicate the claimant's problems" but he did not explain how the treatment

15

records documenting the extent of Plaintiff's "problems" support his conclusion that Plaintiff's neuropathy "would not be considered a significant and persistent disorganization of motor function" despite Dr. Saizow's opinion to the contrary. [R. 13, 16-17]. Nor did the ALJ explain how he resolved the apparent inconsistency between his conclusion that the OU Physicians' records indicate Plaintiff's "non-compliance with treatment" and Mr. Crittenden's August 12, 2008 letter reporting that Plaintiff has made all of his appointments and has adhered to both his oral and injected medication plan. [R. 16-17, 1186]. In the absence of ALJ findings supported by specific weighing of the evidence, the Court cannot assess whether relevant evidence adequately supports the ALJ's conclusion that appellant's impairments did not meet or equal any Listed impairment and whether he applied the correct legal standards to arrive at that conclusion. *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). This deficiency must be addressed upon remand.

Finally, the ALJ must provide a legally sufficient reason for attributing more weight to the opinion of a consultative physician than the opinion of a treating physician. *Doyal,* 331 F.3d at 762 ("The treating physician's opinion is given particular weight because of his unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.") (quoting 20 C.F.R. § 416.927(d)(2)). A conclusory statement that the consultative "reports are consistent with the records as a whole" does not suffice. [R. 16]. Upon remand, the Commissioner must demonstrate that he has applied the correct standards in analyzing the treating source's opinion. *Pisciotta v. Astrue*, 500 F.3d 1074, 1077 (10th Cir. 2007) (The ALJ first

considers whether the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with the other substantial evidence in the record. If so, the ALJ must give the opinion controlling weight. If the treating physician's opinion is not entitled to controlling weight, the ALJ must then consider whether the opinion should be rejected altogether or assigned some lesser weight.); 20 C.F.R. §§ 404.1527(d) and 416.927(d) (setting forth relevant factors the ALJ may consider in evaluating the weight to accord treating source evidence). When an ALJ decides to disregard a medical report by a claimant's physician, he must set forth specific, legitimate reasons for his decision. *See Watkins v. Barnhart*, 350 F.3d 1297 (10th Cir. 2003).

## **Conclusion**

This case is REVERSED and REMANDED to the Commissioner to address the medical opinion evidence from Plaintiff's treating source. After doing so, the ALJ must reconsider the record evidence in accordance with the correct legal standards. *See Clifton*, 79 F.3d at 1009-10. Given the nature of this remand, the Court does not address Plaintiff's allegation that ALJ's step five determination is not supported by substantial evidence.

SO ORDERED this 28th day of June, 2010.

*Frank H. McCarthy*
FRANK H. MCCARTHY
UNITED STATES MAGISTRATE JUDGE